EXHIBIT A

VIRGINIA:

IN THE CIRCUIT COURT OF THE CITY OF RICHMOND
John Marshall Courts Building

MARVIN T. BROYHILL, III, )
Individually and on Behalf of the )
Broyhill Trust and Personal Trust, )
And the Estate of Audrey Broyhill )
)
Plaintiffs, )
v. ) Case No. CL10-90-8
)
BANK OF AMERICA, N.A. )
)
Defendant. )
)
)

RECEIVED & FILED
CIRCUIT COURT
1015 JAN 0 7 2010
BEVILL M. DEAN, CLERK
BY ___ D.C.

## COMPLAINT

Plaintiff, Marvin T. Broyhill, III ("Broyhill"), individually and on behalf of the Broyhill Trust and Personal Trust (defined below) and the Estate of Audrey Broyhill, by counsel, files the following complaint against defendant, Bank of America, N.A. ("Bank").

Plaintiff seeks compensatory damages in the amount of $2,500,000 plus punitive damages arising out of the defendant's breach of fiduciary duty, negligence, breach of contract, and conversion. Plaintiff also seeks an accounting of all assets, liabilities, income and expenses of the trusts and estate at issue in this action from 1993 through 2004, and to surcharge and falsify certain Bank fees, costs and unlawful transfers.

### Parties

1. Broyhill is a citizen of Virginia. At all material times, he was a beneficiary of the trusts and estate at issue in this action.

2. Defendant, Bank, is a national banking association with branches and offices throughout Richmond, Virginia.

### Statement of the Facts

1. Broyhill's father died in 1969, leaving a considerable estate. During his life, Broyhill's father

-1-

constantly expressed a distrust of banks: he oft-repeated the maxim that banks "rob widows and orphans". Broyhill's father made Broyhill promise to oversee and protect the financial interests of Broyhill's mother and minor siblings. When Broyhill's father died, two trusts were established under his last will and testament: (A) a marital trust (life estate) for the benefit of his wife, Audrey E. Broyhill ("Audrey"), and (B) a trust for Broyhill and his twin siblings. The trust for Broyhill and his siblings terminated in 1984, and is not at issue in this action

2. Under the terms of the trust for Audrey (hereinafter, the "Broyhill Trust"), Audrey was to receive all income from the trust during her lifetime. Broyhill's father's will permitted Audrey to assign the assets of the trust upon her death. In the absence of such an assignment, the Trust assets were to be equally divided between Audrey's then living children.

1. Throughout the years, administration of the Broyhill Trust has been embroiled in controversy and litigation. Broyhill acted as "watchdog" over the Broyhill Trust and constantly demanded accountings, transparency, and full disclosure. Broyhill's father's will named Henry Fitzgerald and First & Citizen's Bank (later United Virginia Bank) as co-trustees of the Broyhill Trust. Audrey filed suit against United Virginia Bank, then sole trustee, charging that it had engaged in mismanagement and had grossly inflated the value of the Broyhill Trust by, inter alia, listing non-existent assets. Like her late husband, Audrey also had a tremendous distrust of banks and trust officers.

6. United Virginia Bank resigned as trustee and the Bank (then known as Nations Bank) began to act as sole trustee of the Broyhill Trust.

7. After the Broyhill Trust assets were transferred to the Bank, Broyhill and Audrey met with attorney, Patrick Vaughan ("Vaughan"), to discuss various trust and estate planning issues. Also present at the meeting was a stockbroker, named James Simmons, and two (2) Bank trust officers. At the meeting, there was a long discussion about United Virginia Bank's management of the trust, the litigation the resulted in the Bank becoming replacement trustee, and Broyhill's long-term oversight of the Broyhill Trust. Broyhill advised the Bank to employ stop losses on any securities held by the Broyhill Trust. In

terms of estate planning, it was decided that Audrey would make $10,000 annual gifts to reduce her future estate tax liability and would take out a mortgage on her home to provide an advance distribution to her living children. Audrey asked Vaughan to draft a will for her. Audrey insisted that in the will her children be named co-executors and that all of her property be equally divided between her two living children. She also directed that the power of appointment set forth in her late husband's will be used to divide the Broyhill Trust assets upon her death equally between Broyhill and his sister, Deborah A. Broyhill ("Deborah").

8. In January, 1992, Audrey executed a will that reflected her estate planning desires in accordance with the things discussed and decided at the above meeting.

9. During the early 1990s, Audrey's mental facilities deteriorated rapidly. She claimed that ghosts came out of the walls at night; she claimed to have conversations with people who had been dead for many years; etc. The Bank provided Audrey with full-time care givers and the Bank assumed full responsibility for Audrey's financial affairs.

10. On August 6, 1993, a tornado ravaged the City of Petersburg, Virginia, destroying and/or damaging substantially all of Broyhill's property.

11. Shortly after August 6, 1993, Audrey visited Broyhill in Petersburg. Broyhill was shocked by her both her physical and mental condition. condition. Audrey, who had been raised in Petersburg, did not know where she was. She did not even recognize Broyhill's children – her only grandchildren. Audrey remained incompetent and incapacitated until her death.

12. The Bank seized upon the tornado event, and the destruction of Broyhill's property, as an opportunity to abrogate Broyhill's rights as a beneficiary of the Broyhill Trust and to eliminate Broyhill as watchdog over his mother's affairs.

13. The Bank undertook a series of actions that severely damaged both Broyhill and the Broyhill Trust and, ultimately, Audrey's estate.

14. In December 1993 – long after Audrey was incompetent – the Bank had Audrey execute a

durable power of attorney (the "POA"), appointing the Bank as Audrey's attorney-in-fact, with broad powers to transact any and all of Audrey's business and to perform "all things and acts" relating to Audrey's real estate and personal property. This POA nullified an earlier power of attorney held by Broyhill. As a result of the POA, the Bank served as both trustee and de facto beneficiary. Included in the POA was the power and authority to make "outright gifts for estate planning purposes".

15. The same day the Bank had Audrey sign the POA, Audrey signed a deed of gift, transferring her valuable home to herself and Deborah as joint tenants with common law right of survivorship. Broyhill was not aware of the POA or the putative gift to Deborah. The Bank concealed both transactions. Transfer of the home to Deborah was contrary to Audrey's long-standing wish to divide all her property equally between her living children.

16. In addition to the POA, which gave the Bank a "blank check" over Audrey's finances, the Bank created and established a revocable "personal trust" for Audrey (hereinafter, the "Personal Trust"). The Bank served as trustee and all of Audrey's personal finances were turned over to that Trust to manage. At the time these actions were taken, Audrey was mentally incompetent. She distrusted banks and had fought her entire life to avoid having a bank take control of her assets. The Bank knew that Audrey was mentally incompetent. The Broyhill Trust was a fiduciary trust. The Bank was required by law to account for its handling and disposition of Trust assets. The purpose of setting up a revocable trust was to avoid full disclosure of the ultimate use of the funds in the Personal Trust. The Personal Trust also generated a second set of fees for the Bank.

17. Broyhill was not consulted about the creation of the Personal Trust.

18. Upon creation of the Personal Trust, the Bank immediately stopped sending Broyhill accountings from the Broyhill Trust. Unbeknownst to Broyhill at the time, the Bank began rolling over all income from the Broyhill Trust directly into the Personal Trust.

19. In 1990, 1991, and 1992, Audrey made $10,000 tax planning gifts to both of her living children, to Broyhill's wife, and to her two (2) grand children. As trustee of the Personal Trust, the Bank

terminated the $10,000 annual gifts that Audrey had been making. The Bank told Broyhill that it discontinued the annual gifts because it not have the authority to do soand because it anticipated heavy medical expenses due to Audrey's ill health.

20. In truth, the Bank terminated the annual gifts to Broyhill in order to maximize its profit off the Broyhill Trust and the Personal Trust. Under the Trusts, the Bank received an annual fee based on the amount of principal in the accounts and a fee based on the income generated. Terminating the gifts increased the principal in the accounts and generated additional fees for the Bank, which, compounded over a period often (10) years, was enormous. Not only did Broyhill lose the amount of the annual gifts, but, upon Audrey's death, Audrey's estate suffered additional estate taxes as a direct result of the gifts not being made during Audrey's lifetime.

21. Between 1994 and Audrey's death, Broyhill complained to the Bank about termination of the annual gifts and notified the Bank that the Broyhill Trust faced substantial estate tax liability. The Bank ignored Broyhill's notices and threatened Broyhill that, if he took any legal action, all of the Bank's enormous legal fees would be paid out of the Trusts. The Bank's reckless ignorance and gross negligence caused the estate to incur tax it would not otherwise have occurred or which would have been significantly mitigated by prudent and timely estate planning.

22. In January 1996, Vaughan's wife and the Bank's trust officer, Arlene Millican ("Millican"), had Audrey sign a new revocable "personal trust", which purported to "amend" the earlier Personal Trust. Audrey was completely incompetent at the time. The amended Personal Trust provided, inter alia, that if Audrey's home was mortgaged at the time of her death, the Bank would "pay off such indebtedness in full" from the proceeds of the Personal Trust.

23. Vaughan's wife and the Bank's trust officer also had Audrey sign a new will. Under the new will, (A) the Bank became executor, which was something that Audrey had continually expressed opposition to throughout her life, and (B) Audrey assigned her entire interest in the Broyhill Trust to the Personal Trust. The Bank initiated the preparation and execution of the new will.

24. Years earlier, Vaughan had recommended that Audrey take out a mortgage on her house and make an advance disbursement to Broyhill and Deborah. Audrey followed Vaughan's advice. She mortgaged her property and the amount of $600,000 was equally distributed to Broyhill and Deborah. The mortgage was to be paid off by Audrey's estate. Under Audrey's 1992 will, her home would have passed to both Broyhill and Deborah equally. Payment of the mortgage, therefore, would have been borne equally by the beneficiaries. Under the new will and amended Personal Trust, the estate paid of the entire mortgage and Deborah got the house free and clear. As a result of the Bank's actions, Broyhill lost an amount equal to one-half the value of Audrey's home.

25. The Bank refused to give Broyhill a copy of the new will or the Personal Trust instruments until after Audrey's death.

26. In January 1997, Audrey was in the hospital recovering from a hip operation.

27. Following Audrey's January 1997 operation, Deborah had Audrey committed to a nursing home. Deborah immediately moved into Audrey's home and began selling off Audrey's valuable antiques and jewelry. Upon information and belief, the Bank paid the mortgage on the home the entire time that Deborah was living in it. Deborah did not inform Broyhill that Audrey had been committed until the summer of 1997. The Bank made no attempt to collect any rent from Deborah, or to rent the property to a third-party, and subsidized Deborah's quiet possession of Audrey's home until Audrey's death. The Bank also permitted Deborah to loot Audrey's personal property. Estate tax returns prepared and filed by the Bank in late 2003 failed to reference substantial amounts of personal property that had been taken and sold by Deborah. Audrey always maintained sizeable bank accounts outside of the Trusts. TheBank has refused to respond to Broyhill's questions regarding their disposition.

28. In spite of many demands for accountings and information over the years, the refused to provide Broyhill with any disclosures concerning their operation of the Broyhill Trust or the Personal Trust.

29. On several occasions Broyhill asked the Bank if fees were being charged on the Personal

Trust account. The Bank has refused to respond to those questions.

30. In 2002, the Bank made Broyhill a "loan" of $100,000, ostensibly to keep Broyhill quiet. The loan documents expressly provided that the sole source of repayment was to be the proceeds of Broyhill's remainder interest in the Broyhill Trust. Later, the Bank contacted Broyhill and stated that it was going to repay the loan out of Audrey's Personal Trust. Broyhill wrote the Bank and objected to such action, as it was contrary to the terms of the note. The Bank ultimately "paid" the note by returning it to Broyhill as a "distribution" from the Personal Trust/Estate. Deborah had also made Broyhill loans of approximately $100,000 over the years. In January 2004, the Bank simply paid those personal loans out of Audrey's Personal Trust account, without consideration of whether the loans were even enforceable.

31. In the fall of 2002, Broyhill obtained an accounting of the Broyhill Trust from the Arlington Circuit Court. That accounting showed that income from the Broyhill Trust during 2001 was $122,000. However, the Bank charged the Trust $47,000.00 in "Administrative Expenses" and $42,000.00 in "Management Expenses", thereby unreasonably depleting sixty-eight (68%) of the Trust income. The Bank grossly overcharged the Trust and reaped unjust and exorbitant fees. Upon information and belief, the Bank charged similar exorbitant and unearned fees during preceding and subsequent years, unfairly and unlawfully depleting the Trust's income.

32. The 2001 accounting also reveals that during 2001, the Bank churned the Trust accounts by purchasing and selling over $3,200,000.00 in securities in violation of the prudent investor rule. Upon information and belief, churning occurred in preceding and subsequent years as well. The Bank traded the Trust accounts to generate fees for itself – fees over and above the exorbitant and unjustified management and administrative fees already being taken. Upon information and belief, the Bank charged "full-service" brokerage fees on the trades that it conducted in addition to fiduciary management/administrative fees. The Bank never informed Broyhill of any of the trades. Broyhill learned of the churning after-the-fact.

33. Broyhill also discovered from the 2001 accounting that the Bank was transferring funds from

the Broyhill Trust to the Personal Trust.

34. Finally, there was $442,000 in lost value reported in the 2001 accounting. The losses occurred in large part because the Bank negligently failed to implement stop loss orders in trading securities for the Broyhill Trust.

35. After the fall of 2002, Broyhill's efforts to obtain answers and an accounting for his mother, for himself, and for the Broyhill Trust intensified, only to be unceremoniously greeted by obfuscation and stonewalling by the Bank and Vaughan.

36. Audrey died on April 4, 2003.

37. After Audrey died and Millican transferred "estate related responsibilities" to the Bank's "Estate Settlement Group", the Bank (Roberta Nielson) finally produced a copy of the new will and Personal Trust agreement.

38. After Audrey's death, the Bank qualified as executor, and advised Broyhill in writing that it would not make any disbursement for at least one (1) year. Broyhill pointed out to the Bank that he had many serious questions concerning the Bank's financial dealings. Broyhill asked for an advance from Audrey's estate to obtain legal assistance to investigate the Bank's conduct, as attorneys required a substantial retainer. The Bank refused to advance any funds to prevent Broyhill from obtaining legal representation.

39. In June 2003, Broyhill asked the Bank for a number of documents relating to the Broyhill Trust and the Estate. Vaughan notified Broyhill that he now represented the Bank. Vaughan and the Bank refused to consider producing any documents, unless requested by Broyhill's attorney, knowing full well that it's previous denial of funds precluded him from obtaining an attorney.

40. Broyhill has made repeated demands upon the Bank to take action to protect the rights and interests of the Broyhill Trust, the Personal Trust, and Audrey's Estate. Because of the Bank's control of the Trusts and misconduct, any further demand would be futile.

41. Each of the claims asserted in this action is brought within the applicable statute of

limitations. See, e.g., § 8.01-229; § 8.01-243(B); § 8.01-245(B); § 8.01-246.

## COUNT I – BREACH OF FIDUCIARY DUTY

42. Plaintiff restates the allegations in paragraphs 1 through 41 above, and incorporates them herein by reference.

43. The Bank had a confidential relationship with the Broyhill Trust and the Personal Trust and acted as Audrey's attorney-in-fact and provided her advice on many financial matters. As a result of this confidential relationship, and as trustee of the Broyhill Trust, trustee of the Personal Trust, agent and attorney-in-fact under the POA, and trustee and executor under Audrey's will, the Bank is a fiduciary within the meaning of § 8.01-2 of the Virginia Code (1950), as amended.

44. The Bank owed fiduciaries duties to act in utmost good faith and with due regard for the rights and interests of Broyhill (as a beneficiary of the Trusts and the Estate), the Trusts, Audrey, and the Estate. The Bank had a duty to maximize profit for the Trusts and Estate and minimize and mitigate loss. The Bank owed fiduciary duties to disclose anything that would have affected Broyhill, the Trusts and the Estate's decision whether and how to act. The Bank owed fiduciary duties not to favor one beneficiary over the other.

45. The Bank engaged in self-dealing and breached its fiduciary duties to the Broyhill Trust, the Personal Trust, and Audrey's Estate by the following acts and omissions:

a. Failing to disclose the inherent conflict of interest in acting as a trustee of the Trusts and personal agent of the Trust grantor, and failing to obtain a knowing waiver of the conflict by the Trusts and their beneficiaries;

b. Seeking, accepting and exercising fiduciary powers and authority from a person known to be incompetent;

c. Failing to disclose to Trust beneficiaries the intent to seek, accept and exercise fiduciary duties from and on behalf of an incompetent grantor;

d. Discontinuing annual gifts and exposing the Trusts and estate to increased tax liability;

e. Creating the revocable Personal Trust, and conveying assets from the Broyhill Trust to the Personal Trust;

f. Charging fees (double-dipping) to both the Broyhill Trust and the Personal Trust;

g. Charging excessive, unearned, and unreasonable "management","administrative", brokerage and other fees and investment costs to both Trusts in violation of § 26-45.8 of the Virginia Code (1950), as amended;

h. Churning the Trust accounts through the purchase and sale of securities with the intent to generate commissions for the Bank;

i. Failing to act prudently to protect Trust principal by, inter alia, maintaining only cash positions, investing in suitable securities, and/or to place stop loss orders;

j. Allowing Deborah to live free in Audrey's home;

k. Paying one beneficiary's personal obligations with Trust funds;

l. Failing to properly defend the Trust against the payment of unenforceable loans;

m. Failing and/or refusing to account.

46. As a direct result of the Bank's breaches of fiduciary duty, Trust principal was depleted and the value of the Estate was diminished. Plaintiff suffered damage and incurred loss in an amount to be determined by the Jury, but believed to be not less than $2,500,000.00.

## COUNT II – CONSTRUCTIVE FRAUD

47. Plaintiff restates the allegations in paragraphs 1 through 48 above, and incorporates them herein by reference.

48. The Bank consummated numerous transactions to its own material benefit, including creation of the Personal Trust and transfer of assets from the Broyhill Trust to the Personal Trust, cessation of annual gifts, and the encumbrance of Audrey's home by a loan/deed of trust for the benefit of Deborah. These transactions are presumptively fraudulent.

49. As a direct result of the Bank's constructive fraud, Trust principal was depleted and the value of the estate was diminished. Plaintiff suffered damage and incurred loss in an amount to be determined by the Jury, but believed to be not less than $2,500,000.00.

## COUNT III – NEGLIGENCE

50. Plaintiff restates the allegations in paragraphs 1 through 51 above, and incorporates them herein by reference.

51. As trustee, agent and attorney-in-fact and executor, the Bank owed the Trusts and the Estate a duty to exercise the care of those ordinarily skilled in the business, and to exercise a reasonable degree of care, skill and dispatch in carrying out the business for which the Bank was employed.

52. By, inter alia, failing to make annual gifts or take any other action to mitigate estate tax liability, engaging in the purchase and sale of unsuitable securities and failing to maintain an all cash position during a period of stock market turmoil, and failing to raise appropriate defenses to payment of Broyhill's alleged indebtedness to Deborah, the Bank violated § 26-5 and § 26-45.3 et seq. of the Virginia Code (1950), as amended, breached its duties and was negligent.

53. As a direct result of the Bank's negligence, Trust principal was depleted and the value of the estate was diminished. Plaintiff suffered damage and incurred loss inan amount to be determined by the Jury, but believed to be not less than $2,500,000.00.

## COUNT IV – BREACH OF CONTRACT

54. Plaintiff restates the allegations in paragraphs 1 through 53 above, and incorporates them herein by reference.

55. The Bank's actions, detailed above, constitute a breach of the Broyhill Trust and Personal Trust agreements.

56. As a direct result of the Bank's breach of contract, Trust principal was depleted and the value of the estate was diminished. Plaintiff suffered damage and incurred loss in an amount to be determined by the Jury, but believed to be not less than $2,500,000.00.

## COUNT V – CONVERSION

57. Plaintiff restates the allegations in paragraphs 1 through 58 above, and incorporates them herein by reference.

58. The Bank wrongfully exercised and assumed authority over the assets of the Broyhill Trust and the Personal Trust, depriving the Trusts, respectively, of possession and/or their property rights. The Bank wrongfully exerted dominion and control over the Trusts' property in denial of, or inconsistent with, the Trusts' rights and interests.

59. The Bank's actions in transferring funds from the Broyhill Trust to the Personal Trust, in churning the accounts, and taking excessive and unjustified fees constitute conversion.

60. As a direct result of the Bank's conversion, Trust principal was depleted and the value of the estate was diminished. Plaintiff suffered damage and incurred loss in an amount to be determined by the Jury, but believed to be not less than $2,500,000.00.

## COUNT VI – ACCOUNTING, SURCHARGE AND FALSIFICATION

61. Plaintiff restates the allegations in paragraphs 1 through 60 above, and incorporates them herein by reference.

62. In spite of repeated demands by Broyhill, the Bank refused to account for the income and expenses and assets and liabilities of the Broyhill Trust and the Personal Trust, respectively, from 1993 through 2004.

63. In accordance with § 8.01-31 of the Virginia Code (1950), as amended, Broyhill, individually and on behalf of the Trusts and the Estate, requests an accounting of all income and expenses and assets and liabilities of the Trusts from 1993 through 2004.

64. Broyhill requests that the Bank's accountings, which, upon information and belief, were confirmed by the commissioner of accounts, be surcharged and falsified and that the Bank be ordered to disgorge excessive management and administrative fees charged to the Broyhill Trust and the Personal Trust, brokerage fees charged as a result of the churning of the accounts, and distributions unlawfully

made to Deborah from the assets of the Trusts.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons and as demonstrated by further evidence to be developed during discovery, Plaintiff requests the Court to enter judgment against the Bank as follows:

A. Compensatory Damages in an amount not less than $2,500,000;

B. Punitive Damages in the maximum amount allowed by law;

C. An Accounting, Surcharge and Falsification as prayed for in Count VI;

D. Prejudgment interest in the maximum amount allowed by law;

E. Post-judgment interest in the maximum amount allowed by law;

F. Costs and attorney's fees; and Such other and further relief as is just and proper.

**TRIAL BY JURY IS DEMANDED**

DATED: January    , 2010

MARVIN T. BROYHILL, Individually and On Behalf of the Broyhill Trust, the Personal Trust and the Estate of Audrey Broyhill.

*[signature]*

Marvin T. Broyhill III, pro se
120 W. Bank Street
Petersburg, Virginia 23803
(804) 732-6691
Marv@feenixx.com

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND
John Marshall Courts Building

JUN 25 2010

BEVILL M. DEAN, CLERK
BY _____

| | |
|---|---|
| MARVIN T. BROYHILL, III | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. CL10-90 |
| BANK OF AMERICA, N.A., | ) ) |
| Defendant. | ) ) |

## NOTICE OF APPEARANCE

Steven S. Biss, Esquire, hereby notes his appearance in this action as counsel for the Plaintiff, Marvin T. Broyhill, III.

Please direct any and all future communications, pleadings and papers to the undersigned as counsel for the Plaintiff in this matter.

DATED:    June 22, 2010


Signature of Counsel on Next Page

1

MARVIN T. BROYHILL, III

By: ___/s/_____
Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone:   (804) 501-8272
Facsimile:   (202) 318-4098
Email:       stevenbiss@earthlink.net

*Counsel for the Plaintiff*

2